According to the government, the district court's comments at sentencing demonstrate that it erroneously considered the informant's conduct when considering relative culpability and erroneously set aside the quantity of drugs, which would have been one of the most significant factors in determining Samuels's role. The district court found that all seven kilograms should be attributed to Samuels for relevant conduct purposes and then ignored the fact that he acted as the broker for the deal. The district court's comments also indicate that its findings were based on sympathy for Samuels and its belief that the drug guidelines are too high, rather than on a genuine finding that Samuels was a "minimal participant" in this crime.

It is inconsistent to attribute the entire amount of cocaine to Samuels and then grant him a four-level minimal role reduction. "Under the sentencing guidelines, a minimal participant is someone who played a single, limited role in the conspiracy." *United States v. Gaitan-Acevedo,* 148 F.3d 577, 595 (6th Cir. 1998). Those participants who are indispensable to the conspiracy are not entitled to a role reduction pursuant to USSG § 3B1.2. *See United States v. Latouf,* 132 F.3d 320, 332 (6th Cir. 1997), *cert. denied*, 523 U.S. 1086 (1998). As Samuels played a key role in brokering the drug transaction, he did not play a limited role in the conspiracy. Instead, he was indispensable to the completion of the operation. Therefore, the district court's finding that Samuels played a minimal role was clearly erroneous.

## CONCLUSION

Because sufficient evidence supported his conviction and the district court's supplemental jury instruction did not constitute plain error, we AFFIRM Samuels's conviction. However, we VACATE his sentence and REMAND for resentencing without a four-level minimal role reduction.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0373P (6th Cir.)
File Name:  02a0373p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee/*
    *Cross-Appellant,*

    *v.*

CLARK SAMUELS,
    *Defendant-Appellant/*
    *Cross-Appellee.*

Nos. 00-6466/6597

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No.  00-00008—William O. Bertelsman, District Judge.

Submitted:  March 18, 2002

Decided and Filed:  October 29, 2002

Before:  SILER and GILMAN, Circuit Judges; HEYBURN,[*] Chief District Judge.

_____

[*] The Honorable John G. Heyburn II, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

_____

**COUNSEL**

**ON BRIEF:** Ed W. Tranter, TRANTER & MEIER, Fort Thomas, Kentucky, for Appellant. Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee.

_____

**OPINION**

_____

SILER, Circuit Judge. Defendant Clark Samuels appeals his conviction and sentence for aiding and abetting an attempt to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Samuels challenges the sufficiency of the evidence, a supplemental jury instruction, the drug quantity determination, and his mandatory minimum sentence. The government appeals the district court's four-level minimal role reduction. As set forth below, we AFFIRM Samuels's conviction, but VACATE his sentence and REMAND for resentencing.

**BACKGROUND**

Mark Jefferson, a confidential informant for the DEA, suggested Tyreese Pointer of Columbus, Ohio, as a target for a reverse sting operation. Jefferson conducted several cocaine deals with Pointer in 1998. In two of these transactions, Pointer paid for drugs that he never received. Jefferson advised agents that Pointer might be interested in dealing drugs to settle these debts.

In December 1999, Jefferson contacted Pointer to determine whether Pointer was interested in dealing cocaine with him. Jefferson told Pointer that he wanted to make up the money that he owed Pointer. Jefferson asked for the phone number of Clark Samuels, a mutual associate whom

authorize the Government to impose the sentence. The judge may impose the minimum, the maximum, or any other sentence within the range without seeking further authorization from those juries--and without contradicting *Apprendi*.

*Harris*, 122 S.Ct. at 2418.

As the guideline range at a total offense level of 32 and a criminal history category of III is 151 to 188 months, that is less than the maximum penalty provided in 21 U.S.C. § 841(b)(1)(C) of 20 years. Therefore, the rendered sentence of 120 months, or any other sentence up to 188 months, would not be in violation of *Apprendi.*.

**5. Minimal Role Reduction**

The government in its cross-appeal contends that the district court clearly erred in granting Samuels a four-level minimal role reduction pursuant to USSG § 3B1.2(a). "This court will not disturb the district court's determination of a defendant's role in the criminal activity unless it is clearly erroneous." *United States v. Williams*, 940 F.2d 176, 180 (6th Cir. 1991).

USSG § 3B1.2(a) authorizes a four-level reduction of the offense level "[i]f the defendant was a minimal participant in any criminal activity." The commentary explains that this subsection applies to a defendant

who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

USSG § 3B1.2, cmt. n.1.

Amendment right to trial by jury. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490. Because Samuels objected to the district court's drug quantity determination, this court reviews his *Apprendi* challenge to his sentence *de novo*. *United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001).

The district court found Samuels accountable for seven kilograms of cocaine, establishing a base offense level of 32 under the sentencing guidelines. The district court then granted a four-level minimal role reduction. With a total offense level of 28 and a criminal history category of III, Samuels had a guideline range of 97 to 121 months. Relying on the mandatory minimum sentence for offenses involving five kilograms or more of cocaine set forth in 21 U.S.C. § 841(b)(1)(A), the district court imposed a sentence of ten years.

In *United States v. Ramirez*, 242 F.3d 348 (6th Cir. 2001), this court held that under *Apprendi*, "[a]ggravating factors . . . that increase the penalty *from a nonmandatory minimum sentence to a mandatory minimum sentence*, or from a lesser to a greater minimum sentence, are now elements of the crime to be charged and proved." *Id*. at 351-52 (emphasis added). However, before this case was decided, the Supreme Court released its decision in *Harris v. United States*, 122 S.Ct. 2406 (2002), abrogating the mandatory minimum sentence question under *Ramirez*. As stated by that Court:

Whether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt. When a judge sentences the defendant to a mandatory minimum, no less than when the judge chooses a sentence within the range, the grand and petit juries already have found all the facts necessary to

Jefferson called "Big Man" or "Fat Daddy." Pointer did not give Samuels's number to Jefferson but said that he would give Jefferson's number to Samuels. Jefferson wanted to talk with Samuels to confirm that Pointer was still involved in the drug business and for insight on Pointer's financial status and ability to move drugs. Samuels called Jefferson and assured him that Pointer was "still a player in the game."

After Jefferson and Samuels discussed the possible cocaine deal, Pointer talked with Samuels about the deal. Samuels advised Pointer that they could use the money to help their office supply business. Samuels told Pointer that Jefferson planned to offer seven kilograms of cocaine at $17,000 per kilogram.

On January 5, 2000, Jefferson told Pointer that he wanted to make "my debt square with you" and that "[i]f I make it right, there should be no reason why we can't do business like we used to." Jefferson offered to sell Pointer cocaine at $17,000 per kilogram, a price yielding a good profit on resale. During this conversation, Jefferson and Pointer discussed different amounts of cocaine and the possibility of fronting part of it to Pointer and developing an ongoing drug trade. Jefferson noted that Samuels had indicated that Pointer could handle five kilograms at the rate of $17,000 per kilogram.

On January 7, 2000, Jefferson told Pointer that he would have seven or eight kilograms of cocaine available in two shipments. Pointer indicated that he would be able to pay for three kilograms and pay for the rest when the second shipment arrived. Jefferson stated that Samuels had been calling every ten minutes. Samuels had been asking questions "in relation to how things was going; when am I coming; did I have anything presently there, . . . things of that nature."

During this time, Pointer remained in contact with Samuels. Samuels encouraged Pointer to obtain all seven kilograms of cocaine. Samuels offered to hold whatever amount for which Pointer could not pay and said that they would share the profit from the amount they sold.

On January 10, 2000, Jefferson called Pointer while Pointer was visiting Samuels. Pointer attempted to persuade Jefferson to bring the drugs directly to Columbus, Ohio, instead of Covington, Kentucky. Pointer explained that his "people," the buyers, did not want to drive to Kentucky. Jefferson did not want to go to Columbus where he had been arrested on a drug offense. Jefferson then spoke with Samuels about persuading Pointer to come to Kentucky to pick up the drugs. Jefferson explained to Samuels that he did not want to take the drugs to Ohio. Samuels confirmed that Pointer had enough money for three kilograms of cocaine.

Later the same day, Jefferson spoke with Samuels again. Samuels advised Jefferson that they were at a standstill between Cincinnati and Columbus and that the purchase of three kilograms of cocaine was a "done deal." After speaking with Samuels, Jefferson called Pointer again. Pointer said that he would try to convince his buyers to follow him to Covington to pick up the cocaine.

On January 13, 2000, after Jefferson arrived in Covington, he and Pointer spoke three more times. Pointer informed Jefferson that someone would be following him. Jefferson directed Pointer to leave that person at a local Long John Silver's restaurant and to meet Jefferson at a rental house. After speaking to Jefferson, Pointer met Arnell Isbell in Columbus. They traveled to Covington, where Pointer left Isbell at a Long John Silver's. Isbell was arrested at the restaurant. Isbell had agreed to purchase two kilograms of cocaine at $20,000 per kilogram.

While waiting for Pointer to arrive, Jefferson called Samuels. Samuels wanted to do a "cash-and-carry" deal where Jefferson would front the cocaine for which Pointer did not have the money and Samuels would pay Jefferson later. Jefferson also told Samuels that he would pay him a commission for his participation in the deal.

Pointer met Jefferson and Agent Brett Price, who was posing as Jefferson's runner, at the rental house in Covington. Pointer brought almost $60,000 in an attempt to purchase four

quantity of cocaine. Jefferson, Pointer, and Samuels discussed different amounts of cocaine, ranging from two or three kilograms to seven or eight kilograms, and Samuels admits that the parties never settled on a quantity. The parties also discussed the possibility of fronting Pointer. When the transaction finally took place, Pointer had $60,000, enough for 3.5 kilograms of cocaine, but Jefferson offered and Pointer accepted seven kilograms of cocaine.

Samuels also contends that the district court should not have held him accountable for seven kilograms because Jefferson set a price less than market value to prompt the defendants to purchase a greater quantity. Samuels relies on the commentary to USSG § 2D1.1, which allows for a downward departure if the court finds that the government agent in a reverse sting set a price substantially below market value, leading to the defendant's purchase of a significantly greater quantity than his resources would have allowed except for the artificially low price set by the government agent. USSG § 2D1.1, cmt. n.15. The government responds that Samuels waived this argument by not moving for a downward departure. Further, there was no evidence that the price of $17,000 per kilogram was substantially below market value.

The evidence at trial demonstrated that both Pointer and Samuels discussed with Jefferson the possibility of fronting Pointer. Pointer testified that Samuels told him to obtain as much of the cocaine as he could. Although Pointer brought only $60,000 to his meeting with Jefferson, Jefferson offered and Pointer accepted seven kilograms of cocaine. In light of the prior negotiations about fronting Pointer, the quantity of seven kilograms of cocaine was reasonably foreseeable to Samuels. Accordingly, the district court did not clearly err in attributing seven kilograms of cocaine to Samuels.

### 4.   Mandatory Minimum Sentence

Relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Samuels contends that the district court's determination of the amount of drugs by a preponderance of the evidence violated his Fifth Amendment right to due process and Sixth

Under the sentencing guidelines, a defendant's base offense level is determined on the basis of the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, *whether or not charged as a conspiracy*), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . .

USSG § 1B1.3(a)(1) (emphasis added).

Samuels contends that the district court should have started with the amount of money Pointer brought to the transaction ($60,000), divided that amount by the agreed price of $17,000 per kilogram, and arrived at 3.5 kilograms of cocaine. Samuels points out that his presentence investigation report states that Pointer's "intent was to purchase 3.5 kilograms of cocaine which will be used as his relevant conduct."

In further support of his argument that the district court should have attributed only 3.5 kilograms of cocaine to him, Samuels refers to the commentary to USSG § 2D1.1, which provides that in a reverse sting operation, the agreed-upon quantity of drugs more accurately reflects the scale of the offense because the amount actually delivered is controlled by the government. USSG § 2D1.1, cmt. n.12. Samuels argues that because Pointer intended to purchase and had enough money for only 3.5 kilograms of cocaine, the district court should have attributed 3.5 kilograms to Samuels. The commentary to USSG § 2D1.1 regarding a reverse sting is not directly on point because there never was an agreed-upon

kilograms of cocaine. Jefferson offered and Pointer agreed to accept seven kilograms of cocaine. Pointer was then arrested.

Pointer, Isbell, and Samuels were indicted in February 2000. Count 1 charged them with conspiring to possess with the intent to distribute approximately seven kilograms of cocaine in violation of 21 U.S.C. § 846. Count 2 charged the three defendants with aiding and abetting each other in an attempt to possess with the intent to distribute approximately seven kilograms of cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Count 3 charged Pointer and Isbell with a related travel count. Thereafter, Pointer pled guilty and cooperated with the government. The other two went to trial. The jury found Samuels not guilty of the conspiracy count but guilty of the aiding and abetting count. Isbell was convicted of all three counts.

At sentencing, the district court attributed seven kilograms of cocaine to Samuels, establishing a base offense level of 32 under the sentencing guidelines. It reduced Samuels's base offense level by four levels for his minimal role. With a total offense level of 28 and a criminal history category of III, Samuels had a guideline range of 97 to 121 months. Pursuant to 21 U.S.C. § 841(b)(1)(A), the district court sentenced Samuels to the mandatory minimum sentence of ten years.

## DISCUSSION

### 1. Sufficiency of the Evidence

Samuels challenges the sufficiency of the evidence supporting his conviction for aiding and abetting an attempt to possess with intent to distribute cocaine. This court's review for the sufficiency of trial evidence is limited. *United States v. Gaitan-Acevedo*, 148 F.3d 577, 586 (6th Cir. 1998). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To sustain a conviction on aiding and abetting, the jury could find Samuels guilty of the offense either as a principal or as an aider and abettor. *United States v. Mullins*, 22 F.3d 1365, 1368 (6th Cir. 1994). For Samuels to be convicted as a principal, the government must demonstrate his intent to possess with the intent to distribute cocaine and the commission of an overt act that was a substantial step toward committing that crime. *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). When a defendant engages in active negotiations to purchase drugs, he has committed the "substantial step" towards the crime of possession. *Id*. For Samuels to be convicted as an aider and abettor, the government must demonstrate that he "in some way associate[d] himself with the venture such that his participation [was] intended to bring about the crime or make it succeed." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991).

Samuels asserts that he aided and abetted Jefferson only by determining the quantity of cocaine Pointer could purchase and by persuading Pointer to conduct the transaction in Kentucky. He contends that aiding and abetting an informant is not a crime. Samuels further argues that there is no evidence that he did anything to assist in Pointer's attempt to possess the cocaine.

According to Samuels, he twice refused to be involved in the possession of cocaine for distribution during one of his conversations with Jefferson. Samuels, however, ignores the rest of the conversation. Samuels's statements during the conversation demonstrate that he urged Jefferson to front extra cocaine to Pointer so that Samuels could do "cash-and-carry deals" with Pointer.

Samuels also points to two statements by Jefferson indicating Samuels's lack of involvement. Jefferson said to Pointer: "Get the Fatman off the phone. Let men do what men do." During another conversation, Jefferson said: "Fat man can't tell me nothing about this business--for real, I mean he's great guy and ya know, I know he might be able to

court's supplemental instruction discussed not only aiding and abetting but also attempt. Although the district court elaborated further than may have been anticipated, the court's instructions were consistent with the law on attempt and aiding and abetting.

Samuels contends that the district court's supplemental instruction suggested that his attempt with the informant constituted the offense. The government responds that while such liability would have been legally correct under a principal theory, there was no undue suggestion that this was what the jury should find. The district court correctly instructed the jury on the alternative forms of liability.

Samuels further argues that the jury likely convicted Samuels of attempting to aid and abet the paid informant due to the district court's supplemental instruction and the heading of Instruction 21, "Attempt-Aiding and Abetting." As Samuels notes, an attempt to aid and abet is not a crime. The indictment, however, charged Samuels and Pointer with aiding and abetting each other in an attempt to possess with the intent to distribute cocaine. The district court's written instructions and oral supplemental instruction were consistent with the indictment. The supplemental instruction merely clarified that a defendant could be found guilty as a principal or as an aider and abetter and that a defendant could not aid and abet Jefferson, the informant.

Finally, Samuels asserts that the jury was confused by the district court's instructions and reached an inconsistent verdict. An inconsistent verdict does not provide a basis for reversal. *Gaitan-Acevedo*, 148 F.3d at 586.

### 3.   Drug Quantity Determination

Samuels challenges the district court's calculation of the amount of drugs attributable to him. The district court attributed seven kilograms of cocaine to Samuels. This court reviews the district court's findings of fact on the amount of cocaine attributable to a defendant for clear error. *United States v. Jenkins*, 4 F.3d 1338, 1345-46 (6th Cir. 1993).

so" and you do try to shoot them but you fail, because your effort is unsuccessful, that would be an attempt.

To aid and abet, somebody else has got to be guilty and you've got to be assisting them. Okay. So there's a difference there. You cannot aid and abet an offense with only the informant because the informant's not guilty of the offense. And the informant--you could be guilty of the attempt through the dealings with the informant, the attempt to possess the cocaine, failing only because there was no cocaine. You got it? We'll send you all to law school when you get through. It's a good question. That was a good question. Do you feel like I've answered it?

JURORS: (Nodding heads.)

THE COURT: Are there any objections to what I told them?

MS. VOORHEES: I thought you were going to make an additional comment on how to consider it.

THE COURT: All right. You can consider people's conversations or dealings with the informant as shedding light on these basic issues. Okay? You can consider anything anybody said to the informant but you can't conspire with the informant and you can't aid and abet the informant. You could, working with the informant, commit an attempt. All right? Anybody have any objections to that?

(No response.)

THE COURT: I guess not. All right. You may retire to continue your deliberations.

Samuels first argues that the district court's supplemental instruction went beyond the scope of the jury's question and what was agreed upon by counsel. The district court and the parties agreed that the jury's question concerned whether a defendant could aid and abet the informant. The district

negotiate--uh--light fixtures and s--t like that but he don't really know --what we know." The totality of the conversations demonstrates that Jefferson was attempting to play Samuels off Pointer and vice versa. Samuels's statements that Pointer did not have common sense, had not been "the brightest turkey going," and was "an Indian, not a chief," indicate that Samuels believed that he was the driving force behind the deal.

Pointer's testimony further demonstrates Samuels's involvement in the cocaine transaction. Pointer testified that he discussed the deal with Samuels and that Samuels encouraged him to become involved, saying that they could use the money for their office supply business. Samuels told Pointer that Jefferson intended to offer seven kilograms of cocaine at $17,000 per kilogram. Samuels and Pointer agreed that this was a good price, and Samuels told Pointer to go ahead with the deal. Samuels directed Pointer to obtain as much of the cocaine as he could. Samuels said that he would hold whatever amount for which Pointer could not pay and that they would share the profits. Pointer told Samuels that he had an investor from Michigan because he knew that Samuels would share this information with Jefferson. Samuels's argument that Pointer's testimony was not credible fails to undermine the sufficiency of the evidence since "[a]ttacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." *United States v. King*, 272 F.3d 366, 370 (6th Cir. 2001).

Samuels next argues that Pointer's testimony fails to demonstrate that he aided and abetted Pointer. According to Samuels, there must be some assistance in the plan or delivery of the cocaine in order for the government to prove aiding and abetting, and he neither contributed any money nor went to Covington to aid in the transaction. "[T]he essence of the crime of aiding and abetting is the defendant's offering assistance or encouragement to his principal in the commission of a substantive offense." *United States v. Ledezma*, 26 F.3d 636, 642 (6th Cir. 1994). Pointer testified

that Samuels encouraged him to deal cocaine with Jefferson and told him to obtain as much cocaine as he could from Jefferson.

Although Samuels argues that there was no evidence of a substantial step by him, his negotiations with Pointer and Jefferson constitute a substantial step toward committing the crime of possession with the intent to distribute cocaine. In any event, the government was not required to prove a substantial step by Samuels because he was charged as an aider and abettor. Pointer, the principal, committed the substantial step by negotiating and meeting with Jefferson.

Viewing the evidence in the light most favorable to the government, a rational trier of fact could have found beyond a reasonable doubt that Samuels assisted or encouraged Pointer in his attempt to possess with the intent to distribute cocaine.[1]

## 2.  Supplemental Jury Instruction

Samuels contends that the district court's oral supplemental jury instruction prejudiced him and entitles him to a new trial. Because Samuels did not object to the district court's supplemental instruction, this court may reverse his conviction only if the supplemental instruction constituted plain error. *United States v. Combs*, 33 F.3d 667, 669 (6th Cir. 1994). "Plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Id.*

During their deliberations, the jury asked the following question: "Instruction 16 clarifies not using paid informant &

---

[1]Samuels points out that the judgment states that he was convicted of "aiding & abetting attempt to commit conspiracy to possess with intent to distribute controlled substance." The indictment charged Samuels with aiding and abetting an attempt to possess with the intent to distribute cocaine, and the instructions to the jury were consistent with the indictment. On remand, the judgment should be corrected to reflect the proper conviction.

defendant agreements as toward count 1 [the conspiracy charge]. Does this hold for count 2 [the aiding and abetting charge]." The parties agreed that the jury was trying to determine whether a defendant could aid and abet the informant, after having been instructed that a defendant could not conspire with the informant. After discussing the issue, the district court and the parties agreed to instruct the jury that for a defendant to be guilty of aiding and abetting, the person he aided and abetted had to be guilty of committing a crime. The district court orally answered the jury's question as follows:

> Let me answer it in this way: A person cannot be guilty of aiding and abetting the informant because the informant isn't committing any crime. It's on aiding and abetting. Is Count 2 also on attempt?

> MS. VOORHEES [Assistant U.S. Attorney]: Yes.

> THE COURT: All right. A person could be attempting to possess the cocaine by trying to buy it from the informant thinking it was real. A person did that, they would then be guilty of the attempt. They wouldn't be guilty of just aiding and abetting the informant because the informant's not committing any crime. There's a difference there. All right?
> To aid and abet, they must be aiding someone who is guilty. To attempt, you just have to be making an attempt to--as the name implies, you have to be taking a step toward committing a crime but stop short of committing it because, perhaps, your efforts weren't successful.
> Say attempted murder; in state law, you have to shoot somebody with the intent to kill them but you miss, you made a serious try to do it but you failed, that's an attempt, but you have to make a serious try. It's not just thinking about it or say, "Well, tomorrow I'm going to go down there and shoot so and so," you don't do it. But if you say, "I'm going to go down there and shoot so and