**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0428n.06

No. 12-1779

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 29, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff - Appellee, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| WILLIAM JONES | ) THE EASTERN DISTRICT OF |
| | ) MICHIGAN |
| Defendant - Appellant. | ) |

Before:     KEITH, MARTIN, and COLE, Circuit Judges.

**Per Curiam**. William Jones pleaded guilty to attempted possession of two kilograms of cocaine with the intent to distribute and unlawful use of a communication facility. At sentencing, the Government argued that Jones should be held responsible for attempting to possess five kilograms of cocaine. The district court ultimately estimated the amount attributable to Jones to be between 3.5 and five kilograms. Jones was sentenced to 128 months of imprisonment for his violations.

On appeal, Jones argues that the district court erred regarding the quantity of drugs attributable to him. Although he concedes that an approximation of drug quantity is permitted, he argues that the district court should have determined the drug quantity by the amount of money he brought to the transaction, a calculation which would have given him a lower base offense level. He also argues that the district court erred by applying a two-level enhancement for an alleged leadership role. Because the record sufficiently supports the conclusion that Jones sought more drugs than he

could afford and that his sister acted at his direction in safeguarding the money he intended to use in his attempted purchase, we **AFFIRM** the district court's sentence.

## BACKGROUND

Defendant William Jones is from Philadelphia, Pennsylvania. Seeking a drug supplier, Jones contacted a confidential source ("CS") who in turn introduced him to Special Agent Steven Temprano, an undercover operative with the Drug Enforcement Agency (DEA). Agent Temprano posed as a cocaine supplier capable of selling five kilograms of cocaine. Throughout May 2008, Defendant negotiated by phone with the CS and Agent Temprano to purchase cocaine. Most of these phone calls were recorded. The parties set the price at $21,500 per kilogram. Agent Temprano and Jones arranged to complete the purchase in Michigan. The pair met on May 30, 2008 in Agent Temprano's vehicle. Rather than complete a cocaine deal, Defendant and his sister, who was on the scene with him, were arrested. Agents found $28,000 on Jones' sister, Sheri Jones.

Sheri denied knowledge that she had been involved in a drug transaction. She was never prosecuted. On January 9, 2009, Defendant was charged with one count of attempting to possess cocaine with intent to distribute and two counts of unlawful use of a communication facility. Defendant pleaded guilty to all three counts without a Rule 11 agreement on June 5, 2009. A Presentence Investigation Report ("PSIR") was prepared. It attributed between five and fifteen kilograms of cocaine to Jones and calculated his base offense level at 32. After a three point reduction for acceptance of responsibility, Defendant's total offense level was set at 27. The PSIR recommended a sentencing range of 70–87 months of imprisonment. In response to the PSIR,

Defendant requested a sentencing hearing to contest the drug quantity.  Defendant asserted the drug quantity should have been two kilograms.

On October 22, 2009, the district court held a sentencing hearing.  The Government argued that five kilograms should have been attributed to Defendant and also sought a two-level leadership enhancement.  The only evidence offered was the testimony of Special Agent Temprano, the undercover operative who posed as a drug supplier, and content of the recorded conversations from May 2008 between Defendant, Special Agent Temprano, and the CS.

### *Evidence of Drug Quantity*

Quantity discussions between Agent Temprano, the CS, and Jones vacillated between two kilograms and five kilograms, with various amounts of cocaine potentially secured through "fronting" (i.e., on credit).  In one May 15th conversation, Jones asked the CS for three kilograms.  Jones also requested that he be fronted some cocaine.  His request in a May 15th conversation was rejected by the CS, who told Jones "no money, no honey."  In a different May 15th conversation, Jones' offer to pay for three kilograms and be fronted two was rejected by the CS who told Jones "My friend [Agent Temprano] told me no, man.  You give me three, I give you three."  In a May 28th conversation, Jones told the CS that he wanted five kilograms, but only if one kilogram could be fronted.  In a May 30th conversation with Agent Temprano, Jones said that he only wanted a couple of kilograms.  Later in the same conversation, Jones told Agent Temprano that he wanted "about five" kilograms but only had the money to pay for two.  At the scene of the deal, Jones is initially recorded saying that he wanted five kilograms with three fronted to him.  Later in the conversation, he said that he wanted "at least three" kilograms of cocaine.  After this statement,

Agent Temprano's wire apparently stopped functioning. Agent Temprano testified that immediately before Jones was arrested he "finally agreed that [he] would give [Jones] the five kilograms." However, this statement was not submitted with the recorded evidence. Agent Temprano's DEA 6 Form, a report investigation form submitted when agents implement cash seizures, only mentions that Jones agreed to buy "some cocaine" without stipulating a quantity.

### *Evidence of Leadership Role*

In one call in which Agent Temprano and Jones discussed a meeting place, Agent Temprano heard a female voice in the background of the call telling Defendant where the meeting would take place. When Jones and Agent Temprano met in Temprano's car, Jones told Agent Temprano that he was "going to have the girl that came with him go pick up the money" and that "she was taking care of it for security reasons." Soon thereafter, Sheri Jones, Defendant's sister, exited the hotel carrying a purse and headed straight to Temprano's vehicle where Jones and Agent Temprano were seated. According to Agent Temprano, Jones' sister "goes to the passenger side where [Defendant] was sitting. Mr. Jones rolls down the window. [Sheri] opens her purse, shows me her white bag that was inside the purse, puts the purse on Mr. Jones' lap, opens the white bag and shows me bundles of money that are inside the bag." Agent Temprano explained Sheri's act as "flashing" and testified that drug purchasers "very frequently" give their money to someone else to hold in order to "protect the money from other criminals who may want to steal it," or "protect the money from the police so it doesn't get seized."

***District Court's Ruling***

Regarding drug quantity, the district court decided to estimate the amount attributable to Defendant at between 3.5 and five kilograms, finding "the Defendant was looking for up to five [kilograms] but not over that . . . the likely reality was that he wanted as much as he could get . . . at least 3.5, less than five, even though he at the plea colloquy said two." The district court also decided to apply the leadership enhancement, finding Defendant "used [Sheri] in this transaction, flashing the cash." The district court sentenced Defendant within the recommended guideline range to a term of eighty months.

## ANALYSIS

Defendant appeals the district court's drug quantity calculation and its application of the leadership enhancement. His arguments are unavailing. We address each one in turn.

## I. Drug Quantity Determination

The district court estimated the amount attributable to Defendant to be between 3.5 and five kilograms of cocaine. Defendant contends that the district court should have determined the quantity by the amount of money he brought to the transaction. We disagree because the record shows that Defendant repeatedly indicated that he wanted to possess more cocaine than he could immediately afford.

"This court reviews the district court's findings of fact on the amount of cocaine attributable to a defendant for clear error." *United States v. Samuels*, 308 F.3d 662, 670 (6th Cir. 2002). "A district court's finding is clearly erroneous where, although there is evidence to support it, we are

left with the definite and firm conviction that a mistake has been committed." *United States v. Vasquez*, 560 F.3d 461, 472 (6th Cir. 2009) (internal quotation omitted).

The recorded conversations paint a blurred picture regarding any fixed drug quantity. Quantity discussions between Agent Temprano, the CS, and Jones ranged between two and five kilograms, with various amounts of cocaine potentially secured through fronting. Agent Temprano's own DEA 6 Form only mentions that Jones agreed to buy "some cocaine" without identifying a specific quantity. The last quantity Jones requested in a recorded conversation is "at least three" kilograms of cocaine. While the parties discussed fronting, the record suggests that they never came to an agreement about whether Agent Temprano would front Jones any cocaine. Recorded conversations show that Jones' attempts to secure various amounts of kilograms on credit were rejected. Yet he still pushed to be fronted on the day of the deal, offering to pay for two kilograms if he could be fronted three. As Agent Temprano testified, "What I see [in the transcripts] is that me and him are going back and forth in conversation." Given that the discussions never appeared to settle on a fixed quantity and Defendant continually attempted to obtain drugs on credit, we do not have a definite and firm conviction that the district court was mistaken in its conclusion that Jones intended to walk away with more than he could immediately afford.

The district court's low end estimation of 3.5 kilograms seems to be a cautious choice between "at least three," the last recorded quantity advanced by Jones, and five, the highest number that Jones discussed on the record. Such an estimate is not clearly erroneous when several quantities are equally plausible. *See United States v. White*, 563 F.3d 184, 197 (6th Cir. 2009) (remanding and instructing that "[t]he district court must use conservative estimates in the amount of cocaine it

attributes to the defendant as part of its base offense level, which means . . . taking the lesser of the two amounts to which [a witness] testified"); *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir. 1990) ("If the exact amount [of drugs] cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate. Thus when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.").

Jones contends that the district court should have determined his base offense level by the amount of money he brought to the transaction, $28,000. Given the agreed-upon price of $21, 500 per kilogram, the amount attributable to Jones under such a calculation would be less than two kilograms. In support of this argument, Jones advances Application Note 12 of Section § 2D1.1 of the United States Sentencing Guidelines (amended as Application Note 5 in 2012). The Note sets the attributable quantity as "the agreed-upon quantity" in offenses involving agreements to sell a controlled substance unless "the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance." U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.5 (2012). However, in the absence of a finding by the district court that Defendant and Agent Temprano reached a negotiated quantity, § 2D1.1 is inapposite. *See Samuels*, 308 F.3d at 670 (holding that § 2D1.1 was "not directly on point" where "there was never an agreed-upon quantity of cocaine").

For the foregoing reasons, we do not have a definite and firm conviction that the district court was mistaken in its quantity estimation.

## II.     Leadership Enhancement

Jones challenges the two-level leadership enhancement the district court applied for the role his sister played in the attempted drug purchase. The record, however, sufficiently supports the conclusion that she acted under his control and authority in safeguarding the money Defendant intended to use in the attempted drug purchase.

### A.     Standard of Review

The standard of review applicable to leadership enhancements is unclear. *Vasquez*, 560 F.3d at 473. Traditionally, legal conclusions are reviewed *de novo* and factual determinations are reviewed for clear error. *Id*. However, "the Supreme Court held that a district court's application of the Guidelines should be reviewed deferentially rather than de novo 'in light of the fact-bound nature of the legal decision.'" *Id*. (quoting *Buford v. United States*, 532 U.S. 59, 66 (2001)). Since that decision, the Sixth Circuit has "reserved judgment as to whether the district court's application of § 3B1.1 should be reviewed deferentially or *de novo*." *United States v. Lalonde*, 509 F.3d 750, 764 (6th Cir. 2007) (internal quotations and alterations omitted). We need not resolve this question because Jones is unable to prevail even under *de novo* review.

### B.     Legal Framework

Section § 3B1.1(c) of the United States Sentencing Guidelines requires a two-level enhancement whenever a defendant is found to be "an organizer, leader, manager, or supervisor in any criminal activity . . . ." U.S. Sentencing Guidelines Manual § 3B1.1(c); *see also United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997). A defendant only needs to have such a leadership role over one participant to qualify for the enhancement. U.S. Sentencing Guidelines

Manual § 3B1.1 cmt. n.2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id*. at cmt. n.1. Factors considered in the leadership determination include, but are not limited to:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.4; *see also Lalonde*, 509 F.3d at 765. The Government has the burden of proving the elements of § 3B1.1 by a preponderance of the evidence. *Gort-Didonato*, 109 F.3d at 320.

### C.     Application

Though most of the evidence here is circumstantial, it sufficiently supports the inference that Jones' sister, Sheri Jones, held and flashed the drug money at Defendant's direction.

All together, a female voice was heard articulating a logistical detail of the deal, Jones told Agent Temprano that a woman held his money, and Sheri approached Agent Temprano in his vehicle shortly thereafter, "flashing" bundles of cash at him. These facts, in tandem with Agent Temprano's testimony explaining the significance of such practices (i.e., to protect the money), was sufficient to show that it was more likely than not that Sheri was a criminally responsible party over which Defendant exercised control. *See United States v. Hicks*, No. 98-5382, 1999 WL 1973672, *6 (6th Cir. Nov. 15, 1999) (unpublished table decision) (holding that male defendant exercised control over a woman when he asked her to pick up a van that was supposed to contain cocaine, she knew the van

would contain drugs, and the defendant had previously told an undercover agent that either he or a woman would pick up the drugs).

Jones argues that Sheri is not a participant because she was never convicted. This argument is meritless. *See* U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted.").

Jones also argues that Sheri is not criminally responsible because the record contains no affirmative evidence that Sheri knew she was involved in a drug transaction. Indeed, upon arrest Sheri denied knowing that she had been involved in a drug transaction. However, Jones never provided any credible reason to otherwise explain evidence which suggested that Sheri knew she carried the money for a drug transaction.[1] Nor does Jones offer reason to doubt Agent Temprano's testimony. *See United States v. Morillo*, 8 F.3d 864, 872 (6th Cir. 1993) (holding that although defendant claimed that he did not exercise control over a courier, he offered nothing to rebut the claim that he exercised such control when, on at least one occasion, courier delivered drugs on demand in response to a page from defendant). For these reasons, Jones cannot prevail even under a *de novo* review.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's sentence.

---

[1] In addressing why Sheri would approach a stranger's vehicle without hesitation and open a bag, defense counsel offered that Sheri could have thought Defendant was purchasing a car.