NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0380n.06

No. 12-1181

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 16, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| DAVID ERIKE MACLLOYD, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:  MARTIN, SUHRHEINRICH, and COLE, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.**  A jury convicted Defendant David MacLloyd of conspiring to distribute and to possess with intent to distribute more than five kilograms of cocaine, aiding and abetting another in possessing with intent to distribute cocaine, using a communications facility to commit the cocaine conspiracy, and maintaining a "drug-involved premises."  On appeal, Defendant raises various challenges to his conviction and sentence.  For the reasons that follow, we AFFIRM.

## I.  Background

Brothers David and Clifford MacLloyd ("Defendant" and "Clifford") were wholesale dealers of cocaine in the Detroit area in 2007-2008.  Defendant handled the finances and Clifford handled the distribution.  They bought multiple kilograms of cocaine weekly from Nick Sanabria ("Sanabria"), who purchased the drugs from a connection in Arizona, Claudio Serrano ("Serrano").

-1-

Sanabria hired Jose Santiago ("Santiago") to transport the drugs and money between Arizona and Michigan. Santiago in turn hired his cousin, Richard Ochoa ("Ochoa"), to drive between Arizona and Michigan. In mid-2007, Santiago got out of the business, and introduced Ochoa to Serrano. Ochoa and Serrano began working together directly, and Ochoa delivered the cocaine to Defendant in Detroit. Ochoa hired other drivers too, including Robert Green, in the summer of 2007. He gave Green money for suitable clothes and provided him with a Mercedes SUV and then a Hummer with custom-built hidden compartments or "traps" for transporting drugs and money. The Mercedes could hold up to twenty kilograms per trip; the Hummer could carry up to forty kilograms at a time. Ochoa and Green made seven to ten trips together; each averaging forty kilos. Green made more than ten trips after that, again averaging forty kilos of cocaine per trip.

In February 2008, Defendant eliminated Ochoa from the organization and asked Green to work for him directly. Defendant and Green flew to Arizona to meet Serrano. Defendant had his girlfriend, Jamie Henderson (now "Lasco")[1], prepare a letter to Serrano, in Spanish.[2] The letter stated that Defendant and his brother wanted to deal directly with Serrano, and was signed by Defendant. Green took Defendant to the home of Serrano's nephew, Marcos, where Ochoa had previously met Serrano, and where the drugs were packaged. Defendant left the letter for Serrano with Marcos. After receiving the letter, Serrano called Defendant and they met at a restaurant. Defendant told Serrano he was Ochoa's Detroit customer, and they discussed dealing directly with each other. Defendant said that he wanted forty to fifty kilograms of cocaine, and he was preparing

---

[1]Henderson was using her married name, Lasco, at the time of trial.

[2]Lasco used her computer. A computer program translated the letter into Spanish.

a truck with a hidden compartment that would hold 100 kilograms at a time. Defendant introduced Green as the "chauffeur" who would drive the drugs and money.

Defendant and Serrano met again, this time at Marcos's house, where Serrano's nephews were packaging cocaine. Serrano had a signature style of packaging the cocaine – "some like greasy stuff mixed with Tide soap, and then we would wrap it with plastic and then we would put tape." (R. 198 ID# 1557) Defendant paid Serrano an extra $1,000 a load to have Serrano's people help with the wrapping. They discussed future business together. Serrano decided that they needed a different "stash" house. Serrano located a house, 9524 East Baywood, Mesa, Arizona, and Defendant gave Serrano the deposit and rent money.

Between February 2008, when Serrano began dealing directly with Defendant, and the end of the conspiracy, Defendant made repeated purchases from Serrano, of more than twenty kilograms.

After Defendant and Green returned to Michigan, Defendant wire-transferred $48,000 to Green, who used it to buy a Ford F-250 diesel pickup truck and have it modified to add an external diesel tank and hidden compartment. On his next trip, Green carried forty kilograms of cocaine to Detroit in the new truck.

Lasco, Defendant's girlfriend, helped Defendant count money that Defendant said came from drug trafficking. Lasco also made Defendant's travel arrangements for his trips to Arizona, which were "[f]or the purpose of arranging drug deals." (R. 199 ID# 1742)

The Drug Enforcement Agency ("DEA") began investigating the brothers in 2008. On March 14, 2008, agents intercepted calls between Clifford and Jujan Burns, in which Clifford agreed to sell Burns two kilograms of cocaine for $22,500 per kilogram. The agents witnessed the meeting between Clifford and Burns. They saw Burns take something from Clifford's truck and transfer it

to his own car. The officers stopped Burns shortly thereafter and found two kilograms of cocaine in his trunk. The kilos were wrapped in axle grease and duct tape. Several hours later Clifford was arrested as he delivered another two kilograms to Burns.

Still later that same day, the officers executed a search warrant on Clifford's home at 1474 Robert Bradbury, Detroit. They seized eleven more kilograms of cocaine coated with red axle grease and wrapped in duct tape; an assault-type rifle; a handgun; ammunition for both guns; a digital scale; baggies; an electronic money counter; and 390 tablets of ecstasy.

On April 29, 2008, Green delivered twenty-four kilograms of cocaine to a house in Grosse Pointe, at Defendant's direction. Clifford met him there to unload the drugs. Green spent the night at a Holiday Inn Express in Warren, Michigan. Defendant paid for the room and listed his own Cadillac on the registration.

The next day, April 30, 2008, Green lunched with Defendant and then left town for a vacation in Las Vegas. Agents arrested him just outside of Detroit. Green had $30,000 in the F-250's hidden compartment, left over from the last Arizona trip, and $2,000 in cash in the glove compartment, which Defendant had given him for his vacation trip.

Green agreed to cooperate in the investigation. After returning from his vacation, Green went to Lasco's apartment, where Defendant often stayed. Defendant gave him $220,000 to buy more cocaine. Green drove to Arizona with DEA Agent Donald Grace. Green met Serrano's relatives at 9524 East Baywood. Green wore a recording device and his phone calls were being monitored. Agents heard Green call Defendant from inside the house to report that the quality of the cocaine was good. Officers arrested Serrano before he arrived.

That same day, agents executed search warrants at six places, including 9524 East Baywood and two other residences in Mesa; 2965 Parkway Circle, Sterling Heights, Michigan, which Defendant had rented for Lasco; 34427 Sea Oats, Sterling Heights, which Defendant had rented for himself; and a storage unit. They found twenty-seven kilograms of cocaine in the house on Baywood. Agents seized a baggie of cocaine and $209,000 at Defendant's apartment on Sea Oats. At Lasco's apartment, which Defendant also rented, they seized a $200,000 Bentley, and records of Defendant's trip to Arizona.

Defendant and Clifford were charged in a superseding indictment with conspiring to distribute and to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1), and with aiding and abetting each other in possessing with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2 (Count 2). Defendant was further charged with eleven counts of using a communications facility to commit or facilitate the cocaine conspiracy, in violation of 21 U.S.C. § 843(b) (Counts 3-5 and 18-25); and with maintaining a drug-involved premises at eight different locations, in violation of 21 U.S.C. § 856(a)(1) (Count 26). The jury was instructed as to four of the eight premises. Clifford pleaded guilty. Several coconspirators (but not Clifford) testified at Defendant's trial.

A jury convicted Defendant on all counts on August 26, 2010. The jury also found that Counts 1 and 2 involved more than five kilograms of cocaine.

Defendant did not move for a judgment of acquittal during trial or within fourteen days of the verdict. His trial counsel was allowed to withdraw in December 2010. New counsel filed an appearance on January 13, 2011. On October 20, 2011, counsel sought permission to file untimely

motions under Rules 29 and 33, untimely objections to the presentence report, and to adjourn the sentencing hearing. The district court granted the motion over the government's objection.[3]

On February 6, 2012, the district court denied Defendant's motions for judgment of acquittal and for a new trial, and then sentenced Defendant to concurrent terms of 360 months' imprisonment on Counts 1 and 2; 48 months each on the telephone counts, and 240 months for maintaining a drug premises, all to run concurrent with each other and the term imposed on Counts 1 and 2.

Defendant appeals. First, he claims there was insufficient evidence to support his convictions on Counts 1, 2, and 26. Second, he claims the district court erred in failing to grant him a new trial because (1) the Government failed to disclose that it gave a significant benefit given to cooperating codefendant Ochoa, (2) the Government failed to disclose that Santiago was a confidential informant during the conspiracy, (3) the court failed to properly instruct the jury regarding the lay and expert testimony of DEA Special Agent Donald Grace, (4) the court allowed testifying codefendant Serrano to refuse to answer defense questions in cross-examination, and (5) the cumulative effect of these errors warranted one. Lastly, Defendant argues that his sentence was procedurally unreasonable because the district court imposed a four-level enhancement for being a leader or organizer, and substantively unreasonable because the court failed to account for the unwarranted disparity between his sentence and that of codefendants Clifford and Green.

---

[3]The district court granted the motion without a finding of "excusable neglect" as required by Fed. R. Crim. P. 45(b)(1)(B). The government does not challenge this failing on appeal, however.

## II. Analysis

## A. Sufficiency of Evidence

This court reviews the district court's denial of motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c) de novo. *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence. *Howard*, 621 F.3d at 460.

### 1. Count 1

Defendant acknowledges the evidence shows that he purchased cocaine from Ochoa, Green, and Serrano, with cash, but that these were nothing more than buyer-seller relationships. Similarly, Defendant contends that Clifford merely purchased drugs from Defendant for his own distribution business. Defendant therefore argues that evidence was insufficient to convict him of conspiracy to distribute and possession with intent to distribute more than five kilograms because the evidence establishes only buyer-seller transactions and not a conspiracy.

To establish a conspiracy under § 846, the government was required to prove "an agreement between two or more individuals, with intent to commit an offense under the Controlled Substance Act." *United States v. Crayton*, 357 F.3d 560, 573 (6th Cir. 2004) (internal quotation marks and citation omitted). The essence of conspiracy is agreement. *Id.* "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan." *Id.* (internal quotation marks and citations omitted).

This court has held that "a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy, for mere sales do not prove the existence of agreement that must exist for there to be a conspiracy." *United States v. Hereford*, 162 F. App'x 439, 441 (6th Cir. 2006) (internal quotation marks and citation omitted). On the other hand, evidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy. *United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 2408 (2012); *United States v. Gunter*, 551 F.3d 472, 482-83 (6th Cir. 2009); *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006); *Hereford*, 162 F. App'x at 441-42.[4]

There is ample additional evidence beyond the mere purchase or sale from which knowledge of the conspiracy may be inferred. The sheer quantity of drugs sold and repeated purchases from a single source, establish a conspiracy. The evidence also established a common plan. Green explained that he received money from Defendant, that he drove the drugs back from Arizona to Detroit, and delivered them to Clifford, who "took the job of distributing the narcotics in the Detroit area." (R. 196 ID# 1331) Lasco also testified that, according to Defendant, Clifford's role in the drug trafficking operation was to "get the drugs and sell them." (R.199 ID# 1738-39) Green stated that the operation depended upon how fast Clifford sold the drugs, how quickly he, Green, could make the drive, and whether Serrano would have more cocaine available. (R. 196 ID# 1358-59) Defendant paid Green's expenses. Green also said that on one occasion, Defendant helped Clifford and Green unload kilos of cocaine from a secret compartment and put it in Clifford's garage. Lasco helped count the money and made Defendant's travel plans for his drug business trips. In short, the

---

[4]Defendant's recitation of case law from other circuits adopting a different rule are inapposite.

jury could easily infer from this evidence that there was a common plan to transport large amounts of cocaine from Arizona purchased from Serrano for distribution by Clifford in the Detroit area and that Defendant was the head of the organization.[5]

## 2. Count 2

Similarly, Defendant claims that the Government did not establish that he did anything to aid and abet Clifford in possessing with the intent to distribute cocaine. To establish possession with intent to distribute a controlled substance under § 841(a)(1), the government was required to prove beyond a reasonable doubt that Defendant knowingly possessed more than five kilograms of cocaine with the intent to distribute it. *United States v. Wettstain*, 618 F.3d 577, 585 (6th Cir. 2010). Possession may be actual or constructive. *Id.* at 586. "Constructive possession requires evidence supporting the conclusion that the defendant had the ability to exercise knowing 'dominion and control' over the items in question." *Id.* (internal quotation marks and citation omitted).

To sustain a conviction for aiding and abetting, the government must prove that the defendant was either a principal or an aider and abettor. *United States v. Samuels*, 308 F.3d 662, 666 (6th Cir. 2002). *See also United States v. Mullins*, 22 F.3d 1365, 1368 (6th Cir. 2002) ("It is axiomatic, however, that the government may always prove the defendant is guilty as a principal, even where the indictment charges only that he acted as an accessory."). To be convicted as a principal, the government had to demonstrate Defendant's intent to possess with the intent to distribute cocaine and that he committed an overt act that was a "substantial step" towards the commission of the crime. *Samuels*, 308 F.3d at 666. "When a defendant engages in active negotiations to purchase

---

[5]Given the abundant evidence of a conspiracy, the court did not err by failing to instruct the jury sua sponte that the mere existence of a buy-seller relationship was inadequate to establish membership in a conspiracy, as Defendant now suggests on appeal.

-9-

drugs, he has committed the 'substantial step' towards the crime of possession." *Id.* (citation omitted). *See also United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007) (same).

Defendant's constructive possession of the cocaine, with intent to distribute, supports his conviction on Count 2 as a principal. *See Wettstain*, 618 F.3d at 586. As discussed above, the evidence established that Defendant "controlled" the cocaine that Clifford distributed. Defendant provided the money, made the arrangements with Serrano, and directed Green's activities, including delivery of the cocaine to Clifford. Moreover, as noted, Green testified that Defendant helped him unload cocaine from a Hummer at Clifford's place. This is enough to show that Defendant aided and abetted Clifford in possessing with intent to distribute cocaine. Further, Defendant also aided and abetted Clifford's distribution by consistently facilitating the delivery of the drugs Clifford distributed.

### 3. Count 26

Defendant contends that the evidence does not establish that he "used" any of the four premises for the purpose of "distributing" cocaine. To prove that Defendant maintained a drug-involved premises, the government had to show that he knowingly leased, rented, or used "any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1); *United States v. Russell*, 595 F.3d 633, 642 (6th Cir. 2010). The drug-related use of the property must be "significant or important." *Russell*, 595 F.3d at 642-43.

Count 26 listed eight properties, but the jury was instructed that it needed to find only that one of the four properties listed in the jury instruction was "maintained as drug-involved premises"

in order to convict Defendant on that count. The evidence supports the conviction with respect to all four properties.

*As to 1474 Robert Bradbury, Detroit, where Clifford lived*: Although Defendant argues that there was no evidence to show that he knew Clifford used his apartment to distribute cocaine, he acknowledges that Green delivered cocaine to that address at least once. Furthermore, the "tools of the trade" seized during the March 14, 2008 search clearly establish it was used for distribution purposes; agents seized eleven kilograms of cocaine, $200,000, a digital scale, packaging materials, a money counting machine, and weapons. Also, Lasco testified that Defendant told her that the money found during the March 2008 raid, which was "from the run that they had just done," belonged to him. (R. 199 ID# 1743) Defendant, as a coconspirator, is vicariously liable under the *Pinkerton* doctrine for maintaining his brother's apartment. *United States v. Myers*, 102 F.3d 227, 237 (6th Cir. 1996); United *States v. Clavis*, 956 F.2d 1079, 1092 (2d Cir. 1992) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)).[6] Use of the apartment to distribute cocaine was reasonably foreseeable to Defendant. *See id.*

*Regarding 2965 Parkway Circle and 34427 Sea Oats, Sterling Heights, which Defendant leased:* The evidence showed that Defendant paid the rent for both apartments. Lasco testified that she counted money and bundled proceeds in the Parkway apartment, and used her computer to make Defendant's travel arrangements between Detroit and Arizona. Green testified that he picked up $220,000 from Defendant at this apartment, for a trip to Arizona. In the Sea Oats apartment officers found a black bag with over $209,000. This is evidence that the apartments were "used" for the purpose of running a drug trafficking business.

---

[6]A *Pinkerton* instruction was given.

*Concerning 9525 East Baywood, Mesa, Arizona, the apartment where the cocaine was packaged*: Serrano's testimony revealed that Defendant paid for the stash house, where the drugs were packaged and picked up by Green. Further, DEA agents searched it (while Green was there) and found twenty-seven kilograms of cocaine.

In short, there was sufficient evidence for the jury to find any one of these places was maintained as a drug-involved premises.

### B. New Trial Motion

Defendant offered four grounds for a new trial. None were successful. He challenges those rulings on appeal.

### 1. Secret Deal

Defendant complains that the Government failed to disclose a promise by prosecutors in the Southern District of Indiana to dismiss drug charges against Ochoa if he testified at Defendant's trial.[7] According to Defendant, this meant that Ochoa was receiving a bigger sentence reduction than he admitted, and that the jury should have known this in assessing his credibility. At trial, Ochoa, testifying for the defense, indicated that his plea agreement stated that the government would recommend a fifty percent reduction in his guidelines range if he testified truthfully.

There are several problems with this argument. First, although on the Government's witness list, Ochoa was called by the defense. The duty to disclose impeaching evidence does not normally apply to defense witnesses. *United States v. Johnson*, 581 F.3d 320, 331 (6th Cir. 2009) (holding

---

[7]Ochoa was indicted in the Southern District of Indiana on April 23, 2008, with possession with intent to distribute cocaine, unlawful possession of a firearm by a convicted felon, possession of marijuna, and forfeiture. The indictment was dismissed in February 2011. Defendant's trial en ded in August 2010.

that the government did not violate *Brady v. Maryland*, 373 U.S. 83 (1963) by not informing the defense of evidence which called into question a defense witness's credibility). Second, the agreement with the prosecutors in the Southern District of Indiana was disclosed in Ochoa's written plea agreement. Defendant introduced the plea agreement at trial and questioned Ochoa about it. That agreement states that Ochoa was pleading guilty to a conspiracy that occurred in the Eastern District of Michigan, the Southern District of Indiana, and the District of Arizona; that the agreement was binding on the Eastern District of Michigan and the Southern District of Indiana; and that "the government will not bring additional charges against defendant based on any of the conduct reflected in the attached worksheets"– in other words, arising out of the conspiracy. Although not pellucid perhaps, dismissing charges already filed against Ochoa was within the scope of the agreement, which not coincidentally, was signed by AUSAs representing the Southern District of Indiana. Third, Ochoa's potential liability in Indiana was obvious, and Defendant knew or should have known this: Ochoa was arrested in Indiana, agents found cocaine and firearms in his house in Indiana, Green picked him up in Indiana while Green was driving between Detroit and Arizona. Furthermore, Defendant questioned Ochoa about his motivation to cooperate. In other words, Defendant should have discovered the purported agreement at the time of trial, so he is not entitled to a new trial on this basis. *See United States v. Garland*, 991 F.2d 328, 335-36 (6th Cir. 1993) (holding that to obtain a new trial on the basis of newly discovered evidence, a defendant must establish that "the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried"). *Cf. United States v. Faulkenberry*, 614 F.3d 573, 590 (6th Cir. 2010) (holding that the government did not violate *Brady* rule by allegedly failing to disclose that

defense witness had previously acted as FBI informant and to disclose reports summarizing FBI interviews with witness, since defense counsel was aware of witness's status, but still hired him as an expert witness, and counsel should have been aware of reports, and "there [was] no evidence that the government had any knowledge as to whether [the defense witness] had in any way misled defendants' counsel regarding the extent of his discussions with the FBI"). Finally, Defendant has no proof of a secret deal between Ochoa and the Government to dismiss the Indiana charges.

### 2. Santiago

Defendant also claims that he did not learn until after trial that Santiago was a DEA informant during the conspiracy.[8] Defendant claims that Santiago's status as a DEA informant was exculpatory evidence because the testimony reflected that Santiago introduced Ochoa to Defendant and ordered Ochoa to supply Defendant with cocaine, which somehow meant that Defendant was entrapped. However, a successful entrapment defense requires a showing that the defendant was not predisposed to commit the crime. *See, e.g., United States v. Amawi*, 695 F.3d 457, 483 (6th Cir. 2012) (for entrapment defense to apply, the evidence must demonstrate "a patently clear absence of predisposition"), *cert. denied*, 2013 WL 221652 (U.S. Feb 25, 2013) (No. 12-8257). Here, the evidence shows at a minimum, that Defendant began buying directly from Serrano shortly after Ochoa took over from Santiago (who was Serrano's original contact), and continued the relationship after Ochoa left the organization, clearly demonstrating that Defendant was not a passive recipient of cocaine from Santiago and Ochoa.

---

[8]Santiago did not testify at trial.

### 3. Agent Grace

Defendant complains that the district court abused its discretion in failing to give a contemporaneous instruction that Agent Grace gave both fact and opinion testimony.[9] Grace testified that he was involved in Clifford's arrest and in searching Clifford's apartment. Grace also explained in the form of an opinion the meaning of some recorded telephone conversations between Defendant and his brother or another member of the conspiracy. The district court gave a special instruction at the end of proofs about Grace's dual role, the day after Grace testified.

Because Defendant did not complain below, we review for plain error. To constitute plain error, "there must be error, (2) that is 'plain,' (3) and that 'affects substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). An error "affects substantial rights" when it "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. If these three conditions are met, an appellate court may exercise its discretion to address the issue if the error seriously affects the fairness or integrity of the judicial proceedings. *Johnson*, 520 U.S. at 467.

Defendant claims there is plain error here, relying on *United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006). In *Lopez-Medina*, we held that the admission of law-enforcement personnel's testimony as both fact and expert witnesses, without a dual-purpose instruction and without any clear demarcation between fact and expert testimony, was plain error. *Id.* at 742–45. This reliance is misplaced. As we recently explained in *United States v. Van*: "*Lopez–Medina* does

---

[9]Defendant does not argue that the district court abused its discretion in allowing Grace to testify in a dual role. *See United States v. Ham*, 628 F.3d 801, 804 (6th Cir. 2011) (noting that this court consistently holds that a law enforcement officer may testify as an expert about a drug dealer's method of operation pursuant to Fed. R. Evid. 702). He also does not complain about the instruction given.

not require a district court to offer such instructions twice; it found error where the district court provided neither a cautionary jury instruction regarding the agents' dual roles nor a clear demarcation between their fact and expert testimony." *United States v. Van*, 427 F. App'x 423, 428-29 (6th Cir. 2011) (finding no error where the district court gave an expert-witness instruction during the jury charge and cautioned the jury that the law enforcement officer testified in two capacities; citing *Lopez-Medina,* 461 F.3d at 745), *cert. denied,* 132 S.Ct. 1123 (U.S. Jan 17, 2012) (No. 11-7793) .[10]

Here, as is *Van*, although a special instruction was not given before Grace testified, the court specifically explained Grace's dual role during the jury charge, one day after Grace testified. In short, as in *Van*, the principle of *Lopez-Medina* was not violated. *See also United States v. Dodson*, 450 F. App'x 505, 510-11(6th Cir. 2011) (finding no error where district court failed to give a contemporaneous instruction, did not identify law-enforcement officer as an expert, but allowed him to give opinion testimony, and in its jury charge, gave pattern jury instruction explaining how the jury should weigh opinion testimony). *Cf. United States v. Vasquez*, 560 F.3d 461, 470-71 (6th Cir. 2009) (finding harmless error where the court failed to give a cautionary instruction because no other evidentiary errors were alleged, and during preliminary instructions, the district court told the jurors that they alone were to determine whether to believe any witnesses and what to believe). In short, this contention is without merit.

### 4. Serrano

Defendant claims that he is entitled to a new trial because Serrano, three times during cross-examination, declined to answer the question presented. He claims that Serrano's invocation of his

---

[10]In *Van*, the defendant objected to the instruction because the officer had not been qualified for an expert, and complained that the court should not have characterized him as an expert. *Van*, 427 F. App'x at 427-28.

Fifth Amendment right against self-incrimination violated his Confrontation Clause rights. Defendant did not object or ask the district court to direct the witness to answer, so we review for plain error.

"The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination." *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 315–18 (1974)). If the witness's invocation of his Fifth Amendment privilege prejudices the defendant's right to cross-examine him, the court must strike the witness's entire testimony and instruct the jury to disregard it. *United States v. Gullett*, 713 F.2d 1203, 1208-09 (6th Cir. 1983).

Defendant objects to three lines of questioning. A review of the record reveals that none of his objections have any merit. First, Defendant complains that Serrano refused to answer questions about his own drug dealing. Defense counsel said: "We assume that you were selling drugs to make money?" Serrano: "I don't know." Defense counsel retorted: "You don't know. It takes money to buy these kilos, doesn't it? Whenever he decide[s] to answer the question, I'll ask another question?" Serrano responded: "Please move to the next question." Defense counsel then continued to question Serrano about whether he was making a profit in the drug business. Serrano's statement "Please move to the next question," was not an invocation of Fifth Amendment. Defense counsel did not pose a real question, and to the extent he did, it was rhetorical.

Next, Defendant objects to Serrano's statement: "I will remain silent." But Serrano's answer came in response to the following question: "You didn't learn your lesson the first time, did you?"

Again, this was a rhetorical question, so the lack of a response by Serrano did not deprive Defendant of any opportunity to attack Serrano's credibility.

Third, referring to Serrano's nephews, who were paid to wrap kilos of cocaine for sale to Defendant, counsel asked whether "You had other people pay them, but they were part of your business?" Serrano responded: "I'm not going to answer that." However, Serrano had already responded to questions from defense counsel about whether he "had a family drug business," and maintained that Primo [Ochoa] and Defendant had paid them for wrapping the cocaine. Moreover, Green had testified that Defendant gave him an extra $1,000 to pay for the special wrapping. In any event, Defendant does not explain how information about who paid Serrano's nephews was relevant to the charges or to Serrano's credibility.

In short, we do not perceive Serrano's responses as invocations of his Fifth Amendment privilege at all. Moreover, review of the trial testimony demonstrates that defense counsel was able to effectively cross-examine Serrano. *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (stating that"'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish'" (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in *Fensterer*)). There is no plain error here.

### 5. Cumulative Error

Given the foregoing, this issue is moot.

### C. Sentence

Defendant contends that his sentence is both procedurally and substantively unreasonable. He claims it is procedurally unreasonable because the district court improperly applied a four-level

leadership enhancement. He claims the sentence is substantively unreasonable because the court failed to consider the unwarranted disparity between his sentence of 360 months, and Clifford's and Green's sentences, 160 months and 24 months, respectively.

### 1. Leadership Role

We review the district court's factual findings as to an aggravating role enhancement for clear error. *United States v. Castilla–Lugo*, 699 F.3d 454, 459 & n. 5 (6th Cir. 2012), *cert. denied*, 2012 WL 420283 (March 4, 2013) (No. 12-959). This court's standard of review applied to the district court's legal conclusions regarding leadership roles under U.S.S.G. 1B1.1 is "somewhat unsettled," and we have not addressed whether our review "should be deferential rather than de novo." *Id.* at 459. Under either standard, however, the district court properly applied the four-level increase for Defendant's role as an organizer or leader.

A four-level enhancement is appropriate "if the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive." U.S.S.G. 3B1.1(a). In determining whether to apply the aggravating role enhancement and to what degree, courts should consider whether the defendant has exercised decision making authority, recruited accomplices, received a large share of the profits, was instrumental in planning or organizing the offense, and exercised authority over others. U.S.S.G. § 3B1.1 cmt. n. 4; *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009). "A district court need not find each factor in order to warrant an enhancement." *Castilla–Lugo*, 699 F.3d at 460.

Defendant argues that the four-level enhancement was unjustified because he was an equal partner with Green and Clifford, he did not recruit any of the other participants, and he did not get the largest share of the profits. These arguments are unavailing. First of all, the test is whether the

defendant exercised decision making authority. *See Vasquez*, 560 F.3d at 473 (holding that the district court did not err in imposing two-level enhancement for leadership role despite another leader in the offense because it found that the evidence established that the defendant was involved in details of the drug transaction, acted as a supplier to others, and had authority over another). Further, under § 3B1.1(a), Defendant needed to supervise only one other participant. *United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009); *see also* U.S.S.G. § 3B1.1(a) cmt. n.2 (stating that, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer [or] leader . . . of one or more other participants"). As the district court found, Defendant was the "money man," and that, as a consequence, "the other participants who did have defined roles were directed by and led by the defendant in their commission of the offense." (R. 241 ID# 2379) The evidence reflected that Defendant (1) arranged with Serrano to transact business and rent a place in Arizona; (2) decided the amount of cocaine to purchase on a given trip; (3) furnished the money for special vehicles and several apartments where the drug business was conducted; (4) directed Green where to deliver the cocaine; and (5) paid Green's expenses.

The evidence also reflects that Defendant recruited Green, asking him to continue to work after Ochoa left the organization. Defendant also recruited Lasco to help the organization by making travel arrangements and counting huge cash. He paid her rent and gave her a weekly allowance.

Finally, as to profit share: the record reflects that Defendant controlled the money and therefore the operation. His complaint that he only got paid "at the end" reveals the extent of his control, not the extent of his profits in relation to the other coconspirators.

We conclude that the evidence supports the four-level enhancement and that the district court did not err under either standard of review.

## 2. Unwarranted Disparity

Defendant says the disparity between his sentence and Clifford's and Green's sentence renders his sentence substantively unreasonable because the evidence shows that they were responsible for the same quantity of controlled substances attributed to him, more than 150 kilograms.

This argument fails. Section 3553(a)(6) "'concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between codefendants." *United States v. Mitchell*, 681 F.3d 867, 883 (6th Cir. 2012) (quoting *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (emphasis in *Conatser*)). The district court is permitted but not required to consider sentence disparities between codefendants' sentences. *United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007)). A disparity based on another defendant's cooperation is not "unwarranted" within the meaning of 18 U.S.C. § 3553(a). *Mitchell*, 681 F.3d at 883-84. Finally, a codefendant's overly lenient sentence does not render a defendant's within-guidelines sentence substantively unreasonable. *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010) ("As the entirety of [] Benson's argument rests on the proposition that his sentence is unreasonable as compared to his co-defendants, his argument must fail.").

The district court attributed 800 kilograms to Defendant.[11] This was a reasonable estimate based on the testimony. Offense level 38 applies to 150 kilograms or more. U.S.S.G. § 2D1.1.

---

[11]Defendant acknowledges in his reply brief that the trial testimony established more than 150 kilograms of cocaine and that any objection by him "would have been pointless."

With a criminal history category of II, the advisory guideliness range was 360 months to life. His 360-month sentence was at the very bottom of that range. As the district court noted, Defendant's guidelines range understated the seriousness of the offense. Thus, the court could have imposed a much higher guidelines sentence.

Clifford had a advisory sentencing range 151-188 months, based on an offense level of 37 and a criminal history score I. The court sentenced him to 160 months. Green's guidelines range was 87 to 108 months, based on an offense level of 34 and a criminal history score of I. Although Green received only a two-year sentence, he pleaded guilty, cooperated in the investigation by acting as a confidential informant, and testified at trial. He wore a wire to record conversations with Defendant, lead DEA agents to the Arizona residences, and revealed the specially modified vehicles. Given the differences in their guidelines ranges, it cannot be said that the district court abused its discretion, especially when it was not required to consider it at all.

### III.  Conclusion

The judgment of the district court is **AFFIRMED.**