NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0042n.06

Nos. 17-5036/5357/6020

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 28, 2019
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,                )
                                         )
    Plaintiff-Appellee,                  )
                                         )
v.                                       )    ON APPEAL FROM THE
                                         )    UNITED STATES DISTRICT
                                         )    COURT FOR THE EASTERN
JAMES DAREN STURGILL (17-5036),          )    DISTRICT OF KENTUCKY
MELISSA OWENS (17-5357),                 )
and PAUL DEAN GIBSON (17-6020),          )
                                         )
    Defendants-Appellants.               )

Before: CLAY, COOK, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Paul Gibson, Melissa Owens, James Sturgill, and over a dozen other individuals were charged with conspiring to distribute narcotics in the Eastern District of Kentucky. Gibson and Owens pleaded guilty. Sturgill went to trial and was convicted by a jury of conspiring to distribute methamphetamine. All three have appealed. Gibson challenges his guilty plea, claiming it was not competent, knowing, or voluntary. Owens appeals only her sentence, arguing that the district court erred by miscalculating her criminal history score and refusing to give her a minor or minimal role adjustment. Sturgill contests both his conviction and his sentence. He contends that the evidence was insufficient to support his conspiracy conviction and that his sentence was substantively unreasonable. Having considered the arguments raised on appeal, we affirm the judgment of the district court in all three cases.

I.

From August 2014 through April 2015, Paul Gibson captained a drug ring that trafficked methamphetamine, oxycodone, and heroin in eastern Kentucky. Bobby Howard and Leonard Fields played leading roles in Gibson's scheme; they traveled to buy controlled substances from three primary suppliers, sold drugs, and, in Howard's case, kept records of the conspiracy's transactions. Melissa Owens—who was Gibson's girlfriend—arranged transactions, delivered the drugs, and collected cash proceeds. Gibson and his associates supplied narcotics to several local drug dealers, including James Sturgill.

The Drug Enforcement Administration (DEA) began investigating Gibson in August 2014 and made controlled purchases of methamphetamine from Gibson, Howard, and Fields. Around the same time, the Berea (Kentucky) Police Department was investigating Sturgill for drug trafficking. In July 2014, police had twice used a confidential informant to buy methamphetamine from Sturgill and his wife. A search of Sturgill's home yielded methamphetamine and other drug trafficking paraphernalia. Police arrested Sturgill in September 2014; Sturgill indicated that Gibson had supplied the drugs he sold.

By February 2015, the DEA was closing in on the larger Gibson conspiracy. That month, law enforcement stopped Fields's vehicle and found approximately two kilograms of methamphetamine and about fifty oxycodone pills. In April, agents searched Gibson's and Howard's homes, where they found large quantities of cash, various controlled substances, guns, and ledgers detailing drug transactions. An indictment ultimately named Gibson, Owens, Sturgill and over a dozen other individuals tied to the conspiracy; the indictment included those who had supplied the conspiracy with narcotics, as well as those who, like Sturgill, had sold drugs supplied by Gibson.

Gibson and Owens both pleaded guilty to conspiring to distribute oxycodone in violation of 21 U.S.C. § 846. Gibson also pleaded guilty to conspiring to distribute 500 grams or more of methamphetamine, in violation of the same statute. Gibson was sentenced to 288 months' imprisonment. Owens's sentence was 120 months. Sturgill chose to go to trial, after which a jury convicted him of conspiring to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 846. The district court imposed a below-Guidelines sentence of 300 months' imprisonment. Gibson, Owens, and Sturgill all timely appealed.

II.

Gibson argues that his guilty plea was not competently, knowingly, and voluntarily made and that the district court erred by accepting it. We disagree.

A criminal defendant may not plead guilty unless he "is competent to stand trial" and the trial court has "satisf[ied] itself that the [defendant's] waiver of his constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400 (1993). "[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Id.* at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 401 n.12. A district court's determination that a defendant is competent and otherwise capable of pleading guilty is a factual determination that we review for clear error. *United States v. Branham*, 97 F.3d 835, 855 (6th Cir. 1996).

In a written plea agreement, Gibson admitted that he had conspired to distribute 500 grams or more of a substance containing a detectible amount of methamphetamine and a quantity of pills

containing oxycodone. At Gibson's plea hearing, the magistrate judge[1] questioned Gibson extensively to ascertain his competence. Gibson told the magistrate judge that he was forty-five years old, could read and write, possessed a GED, had worked in the construction business, handled his own financial affairs, had never been placed in a guardianship, was not being treated by a psychiatrist or other mental health professional, and had never been diagnosed with any mental illnesses. The magistrate judge noted that, in a competency hearing in a prior case, Gibson had been diagnosed with "borderline intellectual functioning and personality disorder" and had undergone a psychiatric review in the late 1990s. But Gibson indicated that he was not currently affected by any psychiatric conditions and that he could not recall any other diagnoses of mental illness. Gibson also said he had never been treated for drug addiction. He admitted that he had been treated for alcohol addiction after his arrest in this case, but told the court he no longer suffered from alcohol addiction and was not, at the time of the hearing, under the influence of drugs or alcohol. Gibson confirmed that he understood everything the magistrate judge had asked him, that he had been able to understand and communicate with his attorney, who had "explained everything clearly," and that he had no personal doubts about his own competency. When asked, Gibson's attorney indicated that he had experienced no difficulty communicating with Gibson, that Gibson had "assisted effectively in defending the charges," and that Gibson had not behaved in an irrational or erratic manner. Accordingly, counsel saw no need for a competency evaluation. Based on this colloquy, the magistrate judge determined that Gibson was competent to plead guilty.

The magistrate judge then reviewed the plea agreement with Gibson, stopping at intervals to make sure Gibson understood the details of his agreement and the sentencing process generally.

---

[1] Gibson consented to enter his plea before a magistrate judge.

Gibson repeatedly confirmed that he understood. The magistrate judge expressly asked whether Gibson felt in any way coerced to plead guilty, and Gibson affirmed that he signed the plea agreement of his own free will. The magistrate judge concluded that Gibson's plea was knowing and voluntary.

Despite the magistrate judge's thorough colloquy, Gibson argues that the magistrate judge's questions and Gibson's answers ought to have raised serious doubts as to his ability to plead guilty. Specifically, Gibson contends that his past diagnosis of borderline intellectual functioning and personality disorder, his psychiatric review in the late 1990s, and his recent alcohol addiction all concerned the magistrate judge, who should have refused to accept the plea. Gibson further claims that the magistrate judge should not have credited Gibson's responses and those of his attorney because neither was qualified to make a competency determination.

Reviewing the record, we find that the lower court did not clearly err by determining that Gibson was competent to plead guilty. The record does not suggest that Gibson lacked either "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. Likewise, Gibson offers no evidence—beyond his claimed incompetence—to suggest that his plea was unknowing or involuntary. He does not claim, for instance, that he lacked notice of the consequences of his plea, *see United States v. Monie*, 858 F.3d 1029, 1031 (6th Cir. 2017), or that the magistrate judge failed in any respect to comply with its obligations under Rule 11(b), *see United States v. Ataya*, 884 F.3d 318, 323–26 (6th Cir. 2018). Nor does he suggest that his guilty plea was secured through improper threats or other prosecutorial misconduct. *Cf. United States v. Brown*, 96 F. App'x 380, 382–83 (6th Cir. 2004) (rejecting coercion claim as "meritless" where defendant "acknowledged under oath that her guilty plea was

not the result of any threats, coercion or inducements made by the government" and the record confirmed that the plea was voluntary). Here, the magistrate judge's thorough questioning made sure that Gibson was uncoerced and did, in fact, "understand the significance and consequences of" his plea. *Godinez*, 509 U.S. at 401 n.12.

III.

Owens argues that the district court miscalculated her criminal history in two respects: first, by improperly including expunged convictions; and second, by counting two prior sentences separately rather than as a single sentence. She also argues that the district court erred by refusing to apply a minimal or minor role sentence reduction. Finding no error, we affirm Owens's sentence.

*Criminal History Score*. The first two issues Owens raises—her expunged convictions and the separability of her prior sentences—ask whether the district court properly calculated her criminal history score, and, thus, whether her sentence is procedurally reasonable. *See United States v. Shor*, 549 F.3d 1075, 1077 (6th Cir. 2008). We review claims of procedural unreasonableness for abuse of discretion, assessing the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

Owens first argues that two criminal history points should have been removed from her criminal history score after she provided evidence that three of her state convictions had been expunged. Under the Guidelines, "expunged convictions are not counted" when calculating a defendant's criminal history score. *See* U.S.S.G. § 4A1.2(j). But a conviction is considered "expunged" within the meaning of § 4A1.2(j) only if "the adjudication of guilt itself was vacated because of demonstrable innocence or legal error." *Shor*, 549 F.3d at 1078 (citing U.S.S.G.

-6-

§ 4A1.2 cmt. n.10); U.S.S.G. § 4A1.2 cmt. n.10 (stating that sentences set aside "for reasons unrelated to innocence or errors of law . . . are to be counted"). Kentucky's expungement procedure does not demand a showing of innocence or legal error, *see* Ky. Rev. Stat. § 431.078, and Owens offered nothing at sentencing to show that such considerations led to the expungements in her case. Once the government proved the existence of the prior convictions by a preponderance of the evidence, *see United States v. Warwick*, 149 F. App'x 464, 467 (6th Cir. 2005), it became Owens's burden to show that the convictions could not be used to determine her criminal history score. *See, e.g.*, *United States v. French*, 974 F.2d 687, 701 (6th Cir. 1992) ("The burden is upon the defendant to prove the invalidity . . . of the prior conviction."); *see also United States v. Felix*, 561 F.3d 1036, 1044 (9th Cir. 2009) (refusing to apply U.S.S.G. § 4A1.2(j) where criminal defendant offered no evidence his prior conviction was dismissed via the proper procedures). She failed to meet that burden. Accordingly, the district court did not abuse its discretion by using these state convictions to calculate Owens's criminal history score.

Nor did the district court err by treating two of Owens's prior sentences separately. The presentence investigation report (PSR) counted Owens's sentence for a 2008 misdemeanor marijuana possession conviction in Russell County District Court separately from her sentence for a 2012 felony marijuana and cocaine possession conviction in Russell County Circuit Court. Owens was given a suspended sentence of ninety days in jail for the 2008 conviction. For the 2012 conviction, she received three years' imprisonment for possessing cocaine, to run concurrently with twelve months' imprisonment for possessing drug paraphernalia, marijuana, and another unspecified controlled substance. The 2012 sentence was also ordered to run concurrently with a federal sentence Owens was already serving.

Owens argues that the 2008 and 2012 sentences should have been treated as one sentence because they arose out of the same underlying incident. That is, the possession of marijuana underlying the 2008 misdemeanor conviction was the same possession of marijuana penalized by the 2012 felony conviction involving marijuana and other controlled substances.

The Guidelines, however, sometimes require that sentences be treated separately even if they penalized the same underlying conduct. The general rule is that "[p]rior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest." U.S.S.G. § 4A1.2(a)(2). But even if offenses were not separated by an intervening arrest, the Guidelines require that prior sentences be "counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." *Id.* The district court concluded that Owens's sentences should be treated separately because, even though they were not separated by an intervening arrest, "they have different charging instruments . . . and they were not imposed on the same day."

Owens has offered no evidence to refute the district court's conclusion. She states in her appellate brief that the two sentences "resulted from offense[s] contained in the same charging instrument, 'Possession of Marijuana.'" But she offers no proof for this assertion, and the record disproves it. The PSR provided different docket numbers for the 2008 and 2012 sentences, and the sentences were imposed on different dates by different courts in Russell County. The district court did not err by counting Owens's two sentences separately to determine her advisory Guidelines range.[2]

---

[2] Owens also claims that the district court focused on the wrong sentences in denying her objection, considering whether her 2012 state sentence was separate from her 2011 federal sentence for possession of cocaine base with intent to distribute. But she misconstrues what occurred at sentencing. The district court addressed the 2011 federal sentence only because Owens also argued that her 2012 state sentence warranted no criminal history points because it ran concurrently with

*Minimal or Minor Role Reduction.* Lastly, Owens argues that the district court should have departed downward because her role in the conspiracy was "minimal" or "minor." *See* U.S.S.G. § 3B1.2(a), (b) (authorizing a four-level reduction where a defendant was a "minimal participant" and a two-level reduction where the defendant was a "minor participant"). "A minimal participant is one who is 'plainly among the least culpable of those involved in the conduct of a group,' and a minor participant is one who 'is less culpable than most other participants, but whose role could not be described as minimal.'" *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002) (quoting U.S.S.G. § 3B1.2, cmt. nn. 1, 3 (1998)).[3] "The defendant, who is the proponent of the downward adjustment, bears the burden of proving a mitigating role in the offense by a preponderance of the evidence." *United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000). "Whether a defendant is entitled to a downward departure under § 3B1.2 depends heavily on factual determinations, which we review only for clear error." *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002).

The PSR did not recommend that Owens receive a minimal or minor role reduction. When Owens objected, the probation officer explained that Owens's plea agreement stated that she "often delivered oxycodone and other controlled substances and collected cash . . . proceeds from the sales of those substances." The probation officer also noted that Owens "was romantically involved with" the leader of the conspiracy, Gibson, and appeared to "ha[ve] clear knowledge of the scope and structure of the criminal activity" and to have "performed more than a limited

---

the 2011 federal sentence. This was a separate objection, which the district court addressed and rejected after ruling on Owens's claim regarding the relationship between her 2008 and 2012 state sentences.

[3] *Bartholomew* quoted an older version of the Guidelines commentary, but the definitions of minimal and minor participants have remained essentially the same. *See* USSG § 3B1.2, cmt. nn.4–5 (2018).

function in the conspiracy." Examining the evidence, the district court concluded that Owens's "role was neither minimal, nor minor." She was instead "a fully integrated member of the . . . oxycodone conspiracy. She lived with the ring leader, she carried out his orders, and distributed a large quantity of drugs herself."

Owens now seeks to undercut the district court's conclusion, claiming that the government "made references [at sentencing] to wire intercepts indicating [the] nature and extent of the conspiracy and the presence and knowledge of . . . Owens," without introducing the wire intercepts themselves. But the district court expressly based its conclusion on what Owens had "sworn to under oath," not on any representations made by the government at sentencing.

Owens also claims that the district court erred by overlooking her sentencing allocution in which she asserted that "compared to the rest of the people [i]n this case, my role was very minor." But Owens offers no reason that the court should have minimized her sworn admission that she "often delivered oxycodone and other controlled substances and collected cash proceeds from the sales of those substances," in favor of her allocution's characterization of her admitted conduct. She has thus failed to prove that she was either a minor or a minimal participant in the drug conspiracy, and the district court did not clearly err in overruling her objection.

IV.

Sturgill raises two issues on appeal: first, whether there was sufficient evidence to prove he joined Gibson's conspiracy; and second, whether his 300-month sentence was substantively reasonable. Finding the evidence sufficient and the sentence reasonable, we affirm Sturgill's conviction and sentence.

*Sufficiency of the Evidence*. We review Sturgill's sufficiency-of-the-evidence claim de novo. *See United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). We must "determine

'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The jury convicted Sturgill of conspiracy pursuant to 21 U.S.C. § 846, which requires proof of (1) an agreement to violate drug laws, (2) knowledge of and intent to join the conspiracy, and (3) participation in the conspiracy. *United States v. Calvetti*, 836 F.3d 654, 667–68 (6th Cir. 2016). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)). "[A]n agreement must be shown beyond a reasonable doubt," *id.* at 971, but the government need not prove a formal agreement; "'a tacit or material understanding among the parties' will suffice." *Id.* at 970–71 (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)).

Sturgill hangs his sufficiency challenge on this court's oft-repeated statement that "a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy, for mere sales do not prove the existence of agreement that must exist for there to be a conspiracy." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *United States v. MacLloyd*, 526 F. App'x 434, 439 (6th Cir. 2013) (alteration omitted)). Sturgill sees this principle as dispositive because, in his view, the evidence at trial proved nothing more than his "buyer-seller relationship with Gibson and other members" of the conspiracy. Sturgill contends that the government's theory of the case means that anyone who purchased drugs from a member of a conspiracy "would be transformed into a member of the drug conspiracy." The government rejects this characterization and argues that Sturgill's repeated purchases of drugs for resale and his extensive connections to the Gibson

conspiracy were sufficient to lead a rational trier of fact to conclude that Sturgill knowingly and intentionally participated in Gibson's conspiracy. We agree.

Sturgill did not merely buy drugs from Gibson for his personal use; his defense counsel admitted that Sturgill and his wife were engaged in a drug-selling operation of their own. Moreover, when the existence of a conspiracy has been proven—and Sturgill does not dispute the existence of Gibson's conspiracy—"a defendant's connection to the conspiracy need only be slight." *Calvetti*, 836 F.3d at 668 (quotation marks omitted). Here, evidence at trial established a substantial connection between Sturgill and Gibson's conspiracy from which a jury could reasonably infer a "general conspiratorial agreement" to distribute methamphetamine. *Avery*, 128 F.3d at 971.

This court has held that repeated purchases of drugs from members of a conspiracy may be "evidence of more than a mere buyer-seller relationship." *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003). Here, substantial evidence at trial established that Sturgill relied on repeated purchases of methamphetamine from Gibson's conspiracy to supply his personal drug operation:

- Sturgill told a Berea police officer that he was selling methamphetamine purchased from Gibson in 8-ball quantities (about 3.54 grams).

- Gibson sold Sturgill between four and ten 8-balls of methamphetamine per transaction.

- Gibson stopped personally selling to Sturgill in the summer of 2014, but he ordered his associates to "[s]ell [Sturgill] whatever he needed, 8-ball quantities, ounce quantities or half-ounce quantities."

- Howard testified that he repeatedly sold methamphetamine to Sturgill in those amounts.

- Drug ledgers from Howard's house included seven sales to Sturgill, involving ounce or half-ounce quantities of methamphetamine.

Sturgill claims that this evidence is inadequate because "there was no testimony as to the frequency or duration of [his] purchases." But Howard testified that he supplied Sturgill with drugs "at least every other week, and sometimes weekly."

Sturgill purchased significant quantities of methamphetamine. *See Brown*, 332 F.3d at 373 (stating that repeated purchases of a large volume of cocaine supported inference of conspiracy). Gibson testified that the quantities Sturgill routinely purchased—multiple 8-balls or ounces of methamphetamine—were "sell[er] quantities," whereas the typical "user quantit[y]" was a gram. Howard, a longtime methamphetamine user, testified that an average addict would generally use only about a quarter of a gram in order to "stay up for the day." Since one ounce contains 28.35 grams, the jury could have reasonably inferred that Sturgill's ounce-quantity purchases were the equivalent of purchasing around 113 daily doses for an average user. The going rate for an ounce of methamphetamine was $1,800.

Sturgill argues that the jury heard no "testimony that [his repeated methamphetamine] purchases were of such quantity as to be considered 'large.'" This is technically true. But the jury did hear evidence that the quantities Sturgill repeatedly purchased—i.e., seller quantities rather than user quantities—facilitated the conspiracy's distribution of methamphetamine to everyday users. Specifically, the jury heard that Gibson, after acquiring kilogram quantities of methamphetamine from his suppliers, "would distribute [methamphetamine] to a series of street level dealers, who would then distribute it to the every day buyer." Gibson testified that Sturgill was one of the dealers that helped him sell his product. According to Gibson, Sturgill's purchases of selling quantities "further[ed] [his] organization's goals to sell methamphetamine." The reason for this, the jury heard, was that selling methamphetamine on a "gram-by-gram basis"—instead of supplying resale quantities to Sturgill and other dealers—would have been "a lot more dangerous" and a lot less lucrative.

Furthermore, this court need not rely solely on the volume and frequency of Sturgill's purchases to establish more than a mere buyer-seller relationship; other evidence connecting

Sturgill to Gibson and his conspiracy also supports the jury's verdict. When interviewed by police following his September 2014 arrest, Sturgill admitted that he knew Gibson dealt in kilograms of methamphetamine as well as heroin and pills, he understood that Fields "moved narcotics back and forth for [Gibson]," and he had phone numbers for Gibson, Fields, Howard, and Gibson's sister saved on his cell phone. *See United States v. Price*, 258 F.3d 539, 545 (6th Cir. 2001) (explaining that a defendant's connections to other coconspirators may support an inference of conspiracy). Howard testified that he gave Sturgill a discount on the methamphetamine. And on at least one occasion, Howard fronted drugs to Sturgill. Howard said he would not have done that for "just anyone"; he allowed Sturgill to delay payment because he trusted him. We have before held that this kind of "delayed payment arrangement suggests more than a buyer-seller relationship." *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996). Perhaps the most incriminating evidence came when Gibson testified that he called an attorney to help Sturgill get out of jail following his September 2014 arrest. When asked why he would have done this for Sturgill, Gibson said he did that sort of thing "[f]or people that I knowed [sic] that were working for me."

Of course, a rational jury need not have found Gibson and Howard credible and could instead have credited Sturgill's defense that his personal drug operation was, apart from being supplied by Gibson's organization, entirely separate from it. But it is not enough to present a plausible alternative hypothesis. "A defendant claiming insufficiency of the evidence bears a very heavy burden. . . . Circumstantial evidence . . . need not remove every reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (citations and quotation marks omitted). Here, drawing all inferences in favor of the prosecution, a rational jury

could find beyond a reasonable doubt that Sturgill conspired with Gibson and his associates to distribute methamphetamine.

*Substantive Reasonableness*. Substantive reasonableness focuses on whether "a sentence is too long (if a defendant appeals) or too short (if the government appeals)." *Rayyan*, 885 F.3d at 442. "The point is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness." *Id.* Instead, substantive unreasonableness is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.* We review claims of substantive unreasonableness for an abuse of discretion, although we review the district court's factual findings for clear error and its legal conclusions de novo. *Id.* at 440, 442.

Sturgill argues that his 300-month sentence was substantively unreasonable because it "was far greater than the sentences received by" the other defendants. Sturgill's sentence, however, was higher for a reason. The Guidelines recommended a sentence of 360 months to life imprisonment for Sturgill. Unlike the other defendants, Sturgill qualified as a career offender and was ineligible for a downward departure based on acceptance of responsibility. We have often stated that "[a] number of factors might result in legitimate [coconspirator] disparities, including 'differences in criminal histories . . . or one coconspirator's decision to plead guilty and cooperate with the government.'" *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009) (quoting *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008)); *see also United States v. Greco*, 734 F.3d 441, 450–51 (6th Cir. 2013) (rejecting defendant's challenge to sentence that was longer than that of coconspirators despite his "lesser role" in the criminal scheme). Nor was it necessary for the district court to assess the disparities between these particular codefendants in the first place; although Sturgill relies on 18 U.S.C. § 3553(a)(6), he concedes that the focus of this sentencing

factor is on "national disparities, not specific individual cases." *United States v. Gamble*, 709 F.3d 541, 555 (6th Cir. 2013).

At sentencing, moreover, the district court specifically considered Sturgill's lesser role in the conspiracy and the disparity between his and his coconspirators' sentences. The court ultimately chose to vary downward, imposing a sentence sixty months below the bottom of the Guidelines range. Sturgill would have had the district court go even lower. But he does not suggest the district court gave either inadequate or excessive weight to any of the § 3553(a) sentencing factors. Indeed, aside from the disparity argument, he offers no reason to question the substantive reasonableness of the sentence the district court imposed. We find no abuse of discretion in Sturgill's below-Guidelines sentence of 300 months' imprisonment.

\* \* \*

For the reasons stated above, we AFFIRM the judgment of the district court in the three cases.